## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**KAREN L. SWEENEY,**                    Case No. 1:19 CV 964

    Plaintiff,

    v.                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                            MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Karen L. Sweeney ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in April and May 2016, respectively, alleging a disability onset date of March 2, 2016. (Tr. 221-29). Her claims were denied initially and upon reconsideration. (Tr. 187-92, 221-27). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on April 30, 2018. (Tr. 88-116). On September 24, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-30). The Appeals Council denied Plaintiff's request for review, making the hearing decision

the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on April 30, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in August 1976, Plaintiff was 39 years old on her alleged onset date. *See* Tr. 221. She had past work as a receptionist, proofreader, and housekeeping cleaner. (Tr. 111).

At the April 2018 hearing, Plaintiff testified that she worked cleaning houses in 2016, but in 2017 she was working "rarely if that". (Tr. 92-93). Prior to her cleaning work, she worked for four or five years as a receptionist for a fitness company. (Tr. 93). She was promoted within the company to a job reviewing contracts, but fired due to concentration and memory issues. (Tr. 93-95). She also described missing work due to lack of motivation. (Tr. 96-97).

Plaintiff had difficulty interacting with other people at prior jobs due to her anxiety. (Tr. 95-96). Plaintiff also described difficulty with social interaction, that "it feels like a chore". (Tr. 105). She typically let her phone go to voicemail and did not always return calls. (Tr. 106).

Her anxiety had increased; breathing, meditation, and counseling helped. (Tr. 97). Plaintiff "ha[d] to force [her]self" to do chores (Tr. 97) and felt overwhelmed by daily household activities. (Tr. 98). Plaintiff grocery shopped, but did not like to. (Tr. 105) ("I try to get in and out."). She tried to attend her children's school events, and took them to school most days. (Tr. 98). A few times per week she did not get out of bed. (Tr. 106). She napped for three to four hours during the day while her children were in school, and slept about eight hours per night. (Tr. 103).

Plaintiff took several medications, but still experienced anxiety and depression (Tr. 100); she had panic attacks at least twice per week, triggered by feeling overwhelmed (Tr. 100-01), and crying spells triggered by feelings of hopelessness (Tr. 108). Plaintiff also picked at her skin when

2

she was anxious. (Tr. 99). Plaintiff described difficulty concentrating. (Tr. 102) ("I forget it. I have to read it over and over again."). She also described her mind sometimes racing when she watched television and being unable to follow the plot. (Tr. 108-09).

Plaintiff said her right wrist was "better than what it was" before she had surgery (Tr. 101), but it was still sore (Tr. 107). She described difficulty lifting heavy objects, but no difficulty using her fingers. (Tr. 107-08). Plaintiff had residual soreness in her right ankle (Tr. 102), which affected her ability to walk "[o]nce in awhile" (Tr. 103).

Relevant Medical Evidence

*Mental Health*

Beginning in late 2012, Plaintiff received mental health treatment at The Centers for Families and Children for major depressive disorder. (Tr. 321-34, 422-71).

A little over one month prior to her alleged onset date, nurse practitioner Kelley Kauffman noted Plaintiff reported increased depression in the prior weeks, but that anxiety "has been manageable". (Tr. 333). She added Wellbutrin "as adjunct for depression" and noted Plaintiff was also taking Vistaril, Lexapro, Abilify, and Neurontin. (Tr. 334). In April 2016, Plaintiff reported that "she started taking [W]ellbutrin again after stopping it for 4-5 days" and that she was "feeling better" and "more upbeat". (Tr. 335). Plaintiff worked part time at a fitness center, and was "attempting to get cleaning company started." *Id.* Ms. Kauffman encouraged Plaintiff to continue medication compliance. (Tr. 336). In May, Plaintiff rated her anxiety as 8/10 and depression as 6-7/10. (Tr. 488). Ms. Kauffman increased Plaintiff's Wellbutrin and "encouraged improved adherence with [N]eurontin and [V]istaril for improved management of anxiety." (Tr. 489). In June, Plaintiff went to the emergency room for anxiety attacks; she was tearful, but had appropriate mood, affect, and behavior. (Tr. 387-88). In August, Plaintiff described her anxiety as manageable

and rated her depression as 4/10. (Tr. 491). She was self-employed and working part-time as a cleaner. *Id.* Ms. Kauffman described Plaintiff's mood and anxiety as "well managed"; "[s]ituational stressors cause[d] increase[s] in anxiety" but Plaintiff "reporte[d] using coping skills effectively." (Tr. 492). At an emergency room visit in August for another issue, Plaintiff had normal mood and affect, and she was "negative" for confusion and agitation. (Tr. 552).

In September 2016, Plaintiff underwent a psychological consultative examination with Deborah Koricke, Ph.D. (Tr. 414-19). Plaintiff reported she had last worked in 2014.[1] (Tr. 415). Dr. Koricke observed Plaintiff "exhibited good attention throughout the examination and showed no difficulty tracking the conversation." (Tr. 417); *see also id.* ("She exhibited good sustained attention for this examination."). She appeared to understand all questions and instructions and showed a normal rate of responding. *Id.* Plaintiff's thinking was logical and linear, but she had a blunted affect and appeared depressed and teary. *Id.* Her energy level "appeared sluggish". *Id.* Plaintiff described picking at her skin when anxious (Tr. 417), and sleeping much of the day (Tr. 418); she cooked meals, performed chores, and attended church (Tr. 418). Dr. Koricke diagnosed major depressive disorder (recurrent, moderate), and excoriation (skin-picking) disorder. (Tr. 418).

In November, Plaintiff again reported to Ms. Kauffman increase in her anxiety and depression, citing a recent probation violation, noting: "when I get depressed, I get anxious and I do stupid things." (Tr. 493). She picked at her face more due to increased anxiety based on her finances (inability to afford gifts for Christmas, and "cleaning jobs have been sporadic"). *Id.* At a home visit the following day, counselor Jenelle Charter, LPC, noted Plaintiff described her symptoms as more manageable. (Tr. 776). She rated both her anxiety and depression as 5/10. *Id.*

---

1. Dr. Koricke noted this report was contrary to "the report from Kelly Kauffman, RN, NP, dated 3/17/15 that 'clt's cleaning business is doing better – residential cleaning service.'" (Tr. 415).

Plaintiff continued counseling with Ms. Charter through January 2018. *See* Tr. 776-78, 780, 783, 789-92, 797, 799-800, 803, 807, 810-11, 814-15, 825, 828-29, 833. She repeatedly noted that Plaintiff was making "minimal" progress, but was "actively engaged and participated" in counseling. *See id.* Plaintiff discussed personal, family, and financial stressors with Ms. Charter. *See id.* During this time, Plaintiff self-rated her anxiety most often between 5/10 and 7/10 (*see* Tr. 776-77, 780, 792, 796-97, 800, 807, 814-15, 825, 825), though it was occasionally lower (Tr. 790 – 4/10; Tr. 791 – 2/10), and occasionally higher (Tr. 778 – 10/10; Tr. 793 – 10/10). Plaintiff self-rated her depression as 4/10 (Tr. 778, 792, 796, 800, 829), or 5 to 7/10 (Tr. 776, 780, 790-91, 797, 801, 814-15, 825); she sometimes stated she had "no time to be depressed." (Tr. 777, 783). Ms. Charter often noted increased symptoms but that they were "manageable" or Plaintiff was "trying to manage" them. *See* Tr. 776-78, 780, 783, 790-92, 796-97, 799-800, 803, 803, 807, 810, 814-15, 825, 829, 833. Ms. Charter frequently noted Plaintiff was "doing okay under the circumstances" (Tr. 789-91) or feeling "okay" (Tr. 829, 833).

Plaintiff also continued to treat with Ms. Kauffman during this time. In January 2017, she reported her mood was "sucky"; she had run out of Lexapro and noted she "notice[d] a big difference with the [L]exapro." (Tr. 787). Plaintiff needed directions on a cognitive assessment repeated several times, and had difficulty with the visuospatial and executive sections of the assessment. *Id.* Ms. Kauffman restarted Lexapro and diagnosed generalized anxiety disorder, provisional agoraphobia, and rule out depression. (Tr. 788).

At an April 2017 hospitalization, Plaintiff reported no depressive symptoms. (Tr. 686). At a May 2017 hospital visit, Plaintiff was pleasant, and cooperative, with normal mood, affect, and behavior. (Tr. 760). In a July visit with Ms. Kauffman, Plaintiff's chief complaint was "nothing much", though her mood had "been a little bit rough the past couple months." (Tr. 805). Her

anxiety was "ok", and Neurontin helped. *Id.* Ms. Kaufman continued Plaintiff's diagnoses and medications. (Tr. 806). Also in July, Plaintiff told Ms. Charter she made dietary changes and had noticed more energy and fewer naps as a result; however, she also reported difficulty sleeping, with nightmares. (Tr. 807).

In August, Plaintiff had increased symptoms due to discovering that her oldest daughter had an internet relationship with a pedophile; she felt overwhelmed. (Tr. 810). Later that month, she reported increased stress and symptoms, including picking her skin, insomnia, racing thoughts, and paranoia. (Tr. 811). In September, Plaintiff reported weekly panic attacks. (Tr. 815).

In October, Plaintiff told Ms. Kauffman she had "[a] lot of stress in August" related to the incident with her daughter. (Tr. 816). Ms. Kauffman continued Plaintiff's diagnoses and medications. (Tr. 817).

In April 2018, Plaintiff presented to the emergency room for anxiety. (Tr. 876). She reported having been kicked out of her sober living house and "upon arrival home today . . . became very anxious, consumed 5 Red Bulls and Mountain Dew and then began obs[]es[s]ively cleaning th[e] home." *Id.* She had "feelings of panic, anxiety and compulsions to pick at her skin." *Id.* On examination, she was anxious and tearful, but cooperative and in no acute distress. (Tr. 878). Plaintiff was diagnosed with mania and anxiety and discharged with instructions to follow up at Oakview Behavioral Health. (Tr. 880).

*Mental Health Opinion Evidence*

After her consultative evaluation, Dr. Koricke offered an opinion regarding Plaintiff's mental limitations. (Tr. 418-19). She opined Plaintiff had no difficulty understanding, remembering, and carrying out instructions. (Tr. 418). She observed Plaintiff "did not display problems with attention or memory impairment on mental status tasks" and that "maintaining

6

attention, concentration, and persistence and pace to perform multi-step tasks did not seem to be difficult for her", despite Plaintiff's self-report of difficulties with concentration. (Tr. 419). Dr. Koricke noted Plaintiff "was depressed during the interview, but she remained cooperative" and that she had "some difficulty interacting due to blunted affect and depressed mood, but she appeared articulate." *Id.* Plaintiff reported no problems with previous coworkers or supervisors. *Id.* As to work pressures, Dr. Koricke opined Plaintiff "is viewed to have limitations in her ability to respond appropriately to work pressures in an employment setting due to symptoms associated with a persistent depressive disorder and can become anxious and easily overwhelmed." *Id.*

In September 2016, State agency physician Mary K. Hill, Ph.D., reviewed Plaintiff's records and offered an opinion as to Plaintiff's mental residual functional capacity. (Tr. 124-26). She opined Plaintiff had concentration and persistence limitations, specifically, that Plaintiff was moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with, or proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 125). She explained that Plaintiff's symptoms would "limit [concentration/persistence/pace] and her ability to tolerate normal work pressures", but that Plaintiff could "perform [a] variety of tasks w[ith] no more than moderate pace or production quotas." *Id.* Dr. Hill indicated Plaintiff was "not significantly limited" social interaction categories. (Tr. 125-26). Finally, she opined Plaintiff had adaptation limitations, specifically that she was moderately limited in the ability to respond appropriately to change in the work setting. (Tr. 126). She explained that Plaintiff could "adapt to infrequent change." *Id.*

In  December  2016,  Ms.  Kauffman,  Ms.  Charter,  and  Andrew  Hunt,  M.D.,  from  The Centers for Families & Children all signed a mental medical source statement. (Tr. 498-501). Plaintiff had received treatment since October 2012 and attended medication visits bi-monthly, case management visits as needed, and counseling monthly. (Tr. 498). Clinical findings were: low frustration tolerance, depressed mood, anxiety, labile affect, poor concentration, and avolition; her prognosis was "unknown but maybe fair w[ith] continued engagement." *Id.* The providers checked boxes on the form indicating Plaintiff was "[s]eriously limited but not precluded"[2] in: remembering work  procedures;  understanding,  remembering,  and  carrying  out  very  short  and  simple  or detailed instructions; maintaining attendance and punctuality; completing a normal workday and workweek  without  interruptions  from  psychologically  based  symptoms;  performing  at  a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; dealing with normal work stress; setting realistic goals or making plans interpedently;  dealing  with  the  stress  of  semiskilled  and  skilled  work;  and  using  public transportation. (Tr. 499-500). Plaintiff had a "[l]imited but satisfactory"[3] ability in: sustaining an ordinary  routine;  working  in  coordination  with  or  proximity  to  others  without  being  unduly distracted; making simple work related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; being aware  of  normal  hazards  and  taking  appropriate  precautions;  interacting  appropriately  with  the general public; maintaining socially appropriate behavior; adhering to basic standards of neatness

---

2. The  form  defined  this  term  as  meaning  the  "ability  to  function  in  this  area  is  less  than satisfactory, but not precluded in all circumstances" and the "[i]ndividual would be limited in their ability to perform activity 15% of time". (Tr. 499).
3. The form did not define this term. *See* Tr. 499.

and cleanliness; and traveling in unfamiliar places. *Id.* The providers left blank questions requesting that they "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support this assessment." *See id.* They opined Plaintiff would be absent from work due to impairments or treatment "at least 4 days" per month and would be off-task "25% or greater" of an eight-hour workday. (Tr. 500).

In January 2017, Ms. Kauffman and Dr. Hunt signed a mental status questionnaire. (Tr. 601-02). It cited Plaintiff's depressed mood, low energy, difficulty concentrating, insomnia, and full affect. (Tr. 601). It noted poor concentration, noting Plaintiff needed instructions repeated. *Id.* Plaintiff had poor judgment at times due to poor executive functioning. *Id.*

In February 2017, State agency physician Kathleen Malloy, Ph.D., reviewed Plaintiff's records and offered an opinion about Plaintiff's mental residual functional capacity. (Tr. 159-61). Her opinion was similar to Dr. Hill's, but she opined Plaintiff was also moderately limited in her ability to understand and remember detailed instructions, explaining specifically that Plaintiff "is able to perform 1-3 step simple tasks w[ith] no more than moderate pace or production quotas." (Tr. 159). As to Plaintiff's concentration and persistence limitations, Dr. Malloy noted Plaintiff's symptoms would "limit [concentration/persistence/pace] and her ability to tolerate normal work pressures", but that Plaintiff could "perform 1-3 step simple tasks w[ith] no more than moderate pace and no strict production quotas." (Tr. 160). Dr. Malloy noted Plaintiff had "[o]nly mild" social interaction limitations. *Id.* Finally, Dr. Malloy noted Plaintiff would be moderately limited in her ability to respond to changes in the work setting, explaining Plaintiff had "a poor frustration tolerance and difficulties dealing with stress", but she could "adapt to a setting in which duties are routine and predictable and without demands for fast pace or high production." (Tr. 161).

In May 2018, Vincent Carigni, M.D., completed a mental impairment questionnaire. (Tr. 844-45). He noted: "I am not the provider; completing via EMR chart review." (Tr. 844). He noted Plaintiff's "treating source" was Emily Grimm, CNP, and throughout the form wrote "per Emily Grimm, CNP" after his responses. *Id.* Plaintiff's diagnoses were generalized anxiety disorder, rule out major depressive disorder (recurrent severe). *Id.* The clinical findings in support were problems with attention and concentration, severe mood lability, and suicidal ideation. *Id.* Dr. Carigni opined Plaintiff was "[u]nable to meet competitive standards"[4] in every listed area of concentration and persistence and understanding and memory function. (Tr. 844-45). Plaintiff was either "[s]eriously limited but not precluded" or "[u]nable to meet competitive standards" in all areas of social interaction and adaptation. (Tr. 845). He opined Plaintiff would be absent from work "daily" and would be off-task "80%" of an eight-hour workday due to symptoms. *Id.*

*Physical Health*

Prior to her alleged onset date, in September 2015, Plaintiff visited the emergency room for intoxication and a right ankle sprain. (Tr. 301-05).

In late March 2016, Plaintiff went to the emergency room for a left ankle avulsion fracture after a fall. (Tr. 299-301). She was given a splint, crutches, and prescription medication; she was to follow up with outpatient orthopedics in one week. (Tr. 301).

In August 2016, Plaintiff went to the emergency room for right arm pain and swelling. (Tr. 352). She was admitted for right arm cellulitis and possible septic olecranon bursitis. *Id.* On examination, she had a normal gait and sensation. (Tr. 355). Plaintiff underwent a surgical procedure during her hospitalization to drain an abscess in her right elbow. (Tr. 371). At orthopedic

---

4. The form defined this term as "cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting. (Tr. 844).

follow-up later that month, Plaintiff had "little pain" and was "back to work as a cleaner". (Tr. 349). She also had full range of motion. *Id.* That same day, Plaintiff told Ms. Kauffman that she was having trouble with her elbow and it was causing pain. (Tr. 491).

At her September 2016 psychological evaluation, Dr. Koricke noted Plaintiff had normal fine motor skills, and demonstrated no impairment in gait or balance. (Tr. 416-17).

In December 2016, Plaintiff went to the emergency room for painful swelling in her right hand. (Tr. 514). A provider noted that she had the pain for two to three weeks and that it "is worse at the end of the day after working", noting Plaintiff "works as a house cleaner and uses her hands all day." *Id.* Plaintiff was discharged with diagnoses of overuse syndrome and tendinitis. (Tr. 516).

At a December 2016 visit regarding weight management, a provider noted that Plaintiff was "physically active at work, owns a cleaning business." (Tr. 512).

Plaintiff followed up in January 2017 right wrist and hand pain. (Tr. 628). Her examination was suggestive of carpal tunnel syndrome and her provider ordered an EMG and instructed her to follow-up regarding carpal tunnel surgery. (Tr. 629). Plaintiff owned a cleaning company "and uses her hands for work." (Tr. 628). January 2017 EMG findings showed chronic moderate demyelinating right median mononeuropathy at or distal to the wrist with no active denervation, chronic mild demyelinating right ulnar mononeuropathy at the elbow with no active denervation, and chronic mild right C8/T1, C7, and C5/6 radiculopathy with no active denervation. (Tr. 637). Plaintiff underwent a right carpal tunnel release surgery in February 2017. (Tr. 610-14). At a March 2017 post-operative appointment, Plaintiff was "doing quite well", with "[n]o complaints", and gradually improving swelling. (Tr. 838). She was instructed to continue massage and stretching exercises, and follow up in two to three months. *Id.*

11

Plaintiff was hospitalized from April 11 to 12, 2017 with a suspected right wrist fracture and left ankle sprain after a fall. (Tr. 647-712). Her stated goal at discharge was "[t]o get back to work." (Tr. 662).

At a June 2017 follow-up for her carpal tunnel surgery, Plaintiff was again "[d]oing well" with "[n]o complaints"; she had full range of motion in her wrist, and denied any pain. (Tr. 841). Her hand had "completely healed" with "no signs of physical symptoms" and the provider noted she could use her hand normally, with no restrictions. *Id.*

At her April 2018 emergency room visit for anxiety, Plaintiff had normal range of motion and normal musculoskeletal strength, including in her back. (Tr. 878).

Throughout the record, there are notations regarding Plaintiff owning cleaning business where she worked part-time. *See* Tr. 349, 491, 512, 514, 628, 787, 805, 816.

### *Physical Health Opinion Evidence*

In August 2016, State agency physician William Bolz, M.D., reviewed Plaintiff's records and opined she did not have any severe physical impairments because none were expected to last twelve months. (Tr. 122). In March 2017, State agency physician Diane Manos, M.D. agreed, noting Plaintiff's physical impairments were "[n]on-severe/will not last." (Tr. 156).

In June 2018, Diane Kushnar, D.O., completed a "Physical Medical Source Statement". (Tr. 929-33).[5] Therein, she noted she had treated Plaintiff for anxiety, low back pain, obesity,

---

5. While titled a "physical" statement, the undersigned recognizes that Dr. Kushnar cited both physical and mental limitations in this opinion. Plaintiff also cites "[t]he treatment notes supporting this assessment", noting they "were presented after the hearing." (Doc. 13, at 7) (citing Tr. 58-87). However, the ALJ in his decision, noted that this evidence was not timely submitted and he therefore did not consider it:

> On May 22, 2018, the claimant, through her representative, requested an additional 14-days to obtain evidence (Exhibit 10E). The claimant renewed this request at the hearing. The undersigned granted the claimant's request at the hearing and in

ADD, and depression since 2012. (Tr. 929). Plaintiff had symptoms of pain, fatigue, and lack of focus; she had intermittent mild to moderate low back pain, with decreased range of motion and muscle spasms, but that these "episodes" were "rare". *Id.* Dr. Kushnar opined Plaintiff could walk two city blocks without rest or severe pain, sit for two hours at once time and stand for twenty minutes at one time, and sit and stand/walk for four hours total in a workday. (Tr. 930). She needed to: shift positions at will, walk for ten minutes every ninety minutes, and take a five- to ten-minutes unscheduled break every two to three hours. Dr. Kushnar opined Plaintiff could frequently lift ten pounds or less, occasionally lift twenty, and rarely lift fifty. (Tr. 931). She could frequently twist, and occasionally, stoop, crouch, squat, or climb stairs or ladders. *Id.* Finally, she opined Plaintiff was capable of moderate stress (normal work), would be off-task twenty percent of a workday, and would be absent about one day per month. (Tr. 933). Dr. Kushnar wrote: "She is dealing with family issues currently and is very distracted. Emotional stress is limiting her ability to focus." *Id.*

---

writing on May 25, 2018, for 14 additional days (Exhibit 11E). The undersigned made clear in written correspondence that records received after June 5, 2018, would not be admitted to the record. The undersigned admitted evidence received up until June 6, 2018, into the record as Exhibits 19F through 21F. The undersigned received additional exhibits on July 25, 2018 and August 3, 2018. This is well pas[t] 14 days the claimant requested and was granted. Moreover, the claimant has not asked for leave nor explained the circumstances that would have prevent[ed] the evidence from being admitted earlier. Therefore, this evidence has not been admitted into the record.

(Tr. 13-14). It appears Plaintiff attempted to submit this evidence to the Appeals Council, however, evidence submitted to the Appeals Council, but not before the ALJ, is not part of this Court's substantial evidence analysis. *See Cotton v. Sullivan*, 2 F.2d 692, 696 (6th Cir. 1993); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Moreover, beyond summarizing this evidence in the facts section of her brief, Plaintiff does not present any argument as to its relevance, nor does she again cite it. *See* Doc. 13.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 110-15). The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience, who was limited in the way the ALJ ultimately found. *See* Tr. 111-12. The VE responded that such an individual could perform all of Plaintiff's past relevant work, and could perform other jobs such as order puller, laundry laborer, and sales attendant. (Tr. 112). The VE further testified that if an individual needed to work in isolation, all work would be precluded. (Tr. 113). He explained that a brief reminder every hour to stay on task "could be tolerable", but more would not. *Id.* Later, the VE clarified he meant that if this continued beyond the probationary period, it would become a problem because "eventually by then I believe employers would expect the employee to . . . continue at a reasonable pace and remember what needs to be done. (Tr. 113-14). The VE also stated it is work preclusive for an individual to be off-task fifteen percent or more of the workday, or absent two days per month. (Tr. 113).

ALJ Decision

In her September 24, 2018 decision, the ALJ found Plaintiff met the insured status requirements for DIB through September 30, 2019, and had not engaged in substantial gainful activity since March 2, 2016.[6] (Tr. 16). The ALJ found Plaintiff had severe impairments of major depressive disorder, anxiety, excoriation disorder, attention hyperactivity disorder, and chronic mild demyelinating of the right ulnar at the elbow (Tr. 16), but that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment (Tr. 17). Thereafter, the ALJ found Plaintiff had the residual functional capacity:

---

6. The ALJ noted that "[a]lthough concerned the claimant may have engaged in substantial gainful activity in 2016, the undersigned proceeds in the interests of judicial economy." (Tr. 16).

> To perform a full range of work at all exertional levels but with the following
> nonexertional limitations: [she] can frequently handle and finger on the right;
> understand, remember, and carry out simple, routine, and repetitive tasks but not at
> a production-rate pace (e.g. assembly line work); occasionally tolerate changes in
> a routine work setting; and occasionally interact with supervisors and the public.

(Tr. 18). The ALJ concluded that Plaintiff was capable of performing her past relevant work as a

receptionist, proofreader, and housekeeper. (Tr. 28). She also alternatively found Plaintiff could

perform other jobs such as order puller, laundry laborer, and sales attendant. (Tr. 29). Therefore,

the ALJ concluded Plaintiff was not disabled. *Id.*

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &

Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.

Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in his consideration of the medical opinion evidence in this case. She further contends that the ALJ played doctor, discounted opinions simply because they

16

did not support the ALJ's RFC, and failed to discuss Plaintiff's non-severe impairments. Finally, Plaintiff argues the ALJ improperly found Plaintiff could return to past work because she relied on incorrect VE testimony. For the reasons discussed below, the undersigned finds no error.

Medical Opinion Evidence

The bulk of Plaintiff's argument focuses on the medical opinion evidence. Plaintiff contends the ALJ erred in her evaluation of all the medical opinion evidence, challenging – with varying degrees of detail – the ALJ's evaluation of each medical opinion. *See* Doc. 13, at 13-20.

Preliminarily, the undersigned addresses Plaintiff's overarching argument that the ALJ somehow erred in not assigning controlling weight to any particular medical opinion. *See* Doc 13, at 15 ("Based on the foregoing, it is unclear what opinions and/or evidence the ALJ felt was controlling in this matter."); *see also* Doc. 17, at 2 ("The ALJ erroneously discounted all opinions and assessments in the record, so she had no opinions on which she based her RFC."). A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 416.946(c)). An ALJ's RFC determination must be supported by evidence of record, but it need not correspond to, or even be based on, any specific medical opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). Instead, it is the ALJ's duty to formulate a claimant's RFC based on all the relevant, credible evidence of record, medical and otherwise. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013). Therefore, although Plaintiff is correct that the ALJ did not assign "controlling" weight to any particular medical opinion this case, this is not error so long as the RFC, and the ALJ's evaluation of opinion evidence is supported by substantial evidence. For the reasons

17

discussed below, the undersigned finds that it is.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[7] A treating physician's opinion entitled to "controlling weight" if it (1) is supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

---

7. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2016 and thus the previous regulations apply.

For medical opinions from non-treating physicians, an ALJ is to consider the same factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). While "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart*, 710 F.3d at 375. An ALJ need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). ALJs must only provide a meaningful explanation regarding the weight given to particular medical source opinions. *See* SSR 96-6p, 1996 WL 374180, at *2.

*Dr. Kushner*

In her opinion, the ALJ summarized Dr. Kushner's opinion and then explained:

> The undersigned finds good reason not to give Dr. Kushner's opinion controlling weight and assigns this opinion little weight. First, it is not clear on what basis Dr. Kushner determined the claimant had limited range of motion. Examination notes from April 23, 2018, explored above[,] show the claimant had a full range of motion in the back and normal musculoskeletal range of motion and strength. The claimant's obesity is mild and does not support the extreme limitations found by Dr. Kushner. The claimant's mental health treatment, explored above, shows the claimant has moderate symptoms the claimant consistently described as manageable.

(Tr. 23). Plaintiff argues that "[b]ased on the notations in Dr. Kushner's assessment, the ALJ erred in according it little weight." (Doc. 13, at 14). However, she cites nothing other than the opinion itself as support for the opinion. This is circular. Moreover, the ALJ's rationale is supported by substantial evidence and satisfies the "good reasons" requirement. First, the ALJ noted an inconsistency between Dr. Kushner's opinion (issued in June 2018) regarding limited range of motion and a medical record from two months prior that indicated full range of motion. *See* Tr.

878 (noting normal musculoskeletal strength and range of motion, and normal back range of motion). Second, the ALJ noted that Plaintiff's obesity – which Dr. Kushnar cited as a one of Plaintiff's diagnoses (Tr. 929) – was mild and thus did not support Dr. Kushnar's "extreme" limitations. Earlier in her decision, the ALJ evaluated Plaintiff's obesity and explained that "inadequate objective medical findings existed in the record to support more than minimal limitations on the claimant's ability to perform work activities arising from obesity." (Tr. 17). This is a supported conclusion. *See* SSR 01-2p, 2002 WL 34686281, at *2 (BMI below 35 is Level 1 obesity); *cf. Thrash v. Comm'r of Soc. Sec.*, 2014 WL 1266975, at *10 n.4 (S.D. Ohio) (noting that Level 1 obesity can be described as "not significantly obese").  Dr. Kushnar opined Plaintiff could only: sit for two hours at a time, stand for twenty minutes, and sit, stand/walk for four hours total in an eight-hour workday. (Tr. 930). The ALJ reasonably pointed to the two above reasons as inconsistent with such extreme physical limitations. Moreover, Plaintiff herself does not point to any evidence that supports such extreme physical limitations. Finally, the ALJ found Dr. Kushnar's mental health-based restrictions inconsistent with Dr. Kushnar's opinion. *See* Tr. 21-22. Dr. Kushnar stated Plaintiff was "very distracted" and that "[e]motional stress is limiting her ability to focus", opining that she would be off-task twenty percent or more of a workday. (Tr. 833). The ALJ, based on her earlier analysis of Plaintiff's mental health symptoms (which she explicitly incorporated by reference), reasonably discounted these restrictions as more extreme than the record supported. In that earlier analysis, the ALJ explained that Plaintiff's treatment notes (with Ms. Kauffman) and counseling notes (with Ms. Charter) repeatedly showed "moderate symptoms with medication" (Tr. 20), and "manageable" symptoms (Tr. 21).[8] These statements are

---

8. The undersigned also rejects Plaintiff's argument in Reply that these records – pointed to by the Commissioner, are somehow a *post hoc* justification for the ALJ's decision. *See* Doc. 17, at 2. It is not. The ALJ explicitly referenced her prior analysis of Plaintiff's mental health treatment and

supported by substantial evidence in the record. *See* Tr. 776-78, 780, 783, 790-92, 796-97, 799-800, 803, 803, 807, 810, 814-15, 825, 829, 833 (Ms. Charter's notes that Plaintiff had "manageable" symptoms or was "trying to manage" them); Tr. 776-77, 780, 790-92, 796-97, 800, 807, 814-15, 825, 825 (Plaintiff's self-rating of her anxiety and depression generally most often between 5/10 and 7/10); Tr. 333 (Plaintiff's report that her anxiety had "been manageable"); Tr. 335 (Plaintiff's report to Ms. Kauffman that she was "feeling better" after re-starting Wellbutrin); Tr. 492 (Ms. Kauffman's description of Plaintiff's symptoms as "well managed"); Tr. 805 (Plaintiff's chief complaint to Ms. Kauffman as "nothing much" and reporting her anxiety was "ok"). The undersigned finds the ALJ thus provided the required "good reasons" to discount Dr. Kushnar's opinion, touching on the factors of supportability and consistency. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4); *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 112-113 (6th Cir. 2010) (finding good reasons for giving little weight to treating source's opinion where "the objective evidence and [the treating source's] treatment notes do not support the limitations he reported.") (internal citations omitted).

*Opinions Signed by Dr. Hunt*

The ALJ addressed the two opinions co-signed by Dr. Hunt as follows:

Jenelle Charter, LPC; Kelly Kauffman, CNP; and Andrew Hunt, M.D. completed a medical source statement on December 14, 2016 (Exhibit 7F). Treatment notes show that Ms. Sweeney and Ms. Charter completed the statement (Exhibit 17F, page 7).

* * *

Although Dr. Hunt is a treating source, the undersigned declines to give these opinions controlling weight and assigns them partial weight to the extent they support the above residual functional capacity. The medical record above shows the claimant received treatment from Ms. Kaufmann [sic] and Ms. Charter. As

---

symptoms. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 456-57 (6th Cir. 2016) (suffices that ALJ listed inconsistent treatment records elsewhere in the opinion).

!

noted above, the medical record explicitly shows that Ms. Kaufmann [sic] and Ms. Charter completed this statement. Next, the extreme findings are not consistent with the medical record. As explored above, the record consistently shows the claimant experiencing moderate symptoms with medication. Although the claimant was noted to have difficulty following instructions during testing with these treatment providers, notes show this occurred when the claimant was off medication. In fact, the same day the claimant reported that Lexapro made a big difference and was restarted on Lexapro. The claimant did not have concentration problems during her consultative examination and could complete exercises such as serial threes, explored below. Finally, these extreme findings are inconsistent with Kaufmann's [sic] statements below [that] the claimant does not have problems with speech or hygiene.

Kelly Kauffman, CNP, completed another medical source statement on January 26, 2017, a little more than a month after the previous statement (Exhibit 11F).

\* \* \*

The undersigned notes that Ms. Kaufmann [sic] is not an acceptable medical source and her opinions are not entitled to any specific weight. Although the claimant was noted to have difficulty following instructions during testing with Ms. Kaufman [sic], notes show that this occurred when the claimant was off medication. In fact, the same day the claimant reported that Lexapro made "a big difference" and was restarted on Lexapro. The claimant did not have concentration problems during her consultative examination and could complete exercises such as serial threes, explored below.

(Tr. 23-24).

Plaintiff argues the ALJ did not properly evaluate these two opinions under the treating physician rule. First, the undersigned agrees with the Commissioner that it is not apparent that these opinions are entitled to treating physician deference. As the ALJ recognized, the record showed, at least as to the January 2017 opinion, that it was not completed by Dr. Hunt. Although Dr. Hunt co-signed the opinions (*see* Tr. 501, 602), neither party has pointed to evidence in the record that Dr. Hunt directly treated Plaintiff. A mere co-signature, without evidence of a treating relationship, has been found insufficient. *See, e.g., Robinson v. Comm'r of Soc. Sec.*, 2019 WL 342432, at \*8 (N.D. Ohio) ("Here, there is no evidence that Dr. Garven did anything other than co-sign the opinion the day after Lynch filled it out; the opinion is not entitled to deference under the treating physician rule based on the 'team approach' theory."); *Yerg v. Comm'r of Soc. Sec.*, 2016

22

WL 1161749, at *6 (N.D. Ohio 2016) ("[A] physician's signature on an opinion from an 'other source' does not *per se* transfer that opinion from one of an other source to one by a medically acceptable treating source[.]"). And, there was evidence in the record as to both opinions that Dr. Hunt simply co-signed them. *See* Tr. 782 (Ms. Charter's December 2016 note indicating she "[c]onsulted with [Ms. Kauffman] concerning the Mental Medical Source Statement needed . . . for [Plaintiff's] Social Security case . . . Completed and reviewed the assessment together."); Tr. 787 (Ms. Kauffman's January 2017 note that she "[f]illed out SSDI paperwork with clt.").

Second, even if the opinions were entitled to deference, the reasons provided by the ALJ for discounting those opinions are "good reasons" supported by substantial evidence. The ALJ provided similar reasons for discounting both: 1) they were inconsistent with Plaintiff's generally moderate, managed mental health symptoms, and 2) the concentration restrictions were contradicted by other records. For the same reasons discussed above in relation to Dr. Kushnar, the first reason is supported. The ALJ reasonably found Plaintiff's generally moderate mental health symptoms were inconsistent with the more extreme limitations in the two opinions co-signed by Dr. Hunt. Second, the ALJ discounted the concentration limitations by noting that "this occurred when the claimant was off medication." (Tr. 24). This is accurate. *See* Tr. 787 (she had run out of Lexapro and noted she "notice[d] a big difference with the [L]exapro."). And the ALJ cited record evidence to the contrary in the form of Dr. Koricke's consultative examination at which Plaintiff had no focus or concentration problems. (Tr. 24); *see* Tr. 417 (Plaintiff "exhibited good attention throughout the examination and showed no difficulty tracking the conversation"; "She exhibited good sustained attention for this examination"; "When asked to perform serial 3's, she was able to complete the task"). The undersigned finds these reasons – based on inconsistencies in the record – satisfy the "good reasons" requirement for discounting these two opinion. They are

"sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *4.

*Dr. Carigni*

The ALJ addressed Dr. Carigni's opinion as follows:

> The undersigned recognizes that Dr. Carings [sic] is a treating source; however, thee undersigned finds good cause not to give these statements controlling weight but instead little weight. First, on the face of the document, Dr. Carings [sic] does not have a treating relationship with the claimant. Extreme findings such as the claimant being off task 80% of the time are noted to be based on representations made from a non-acceptable medical source. Next, the statement finds the claimant to be significantly more limited than the previous statement, yet there was no significant change in the claimant's medical treatment. As explored above, the record consistently shows the claimant having manageable symptoms with medication. For the same reason, these extreme findings are not consistent with the medical record.

(Tr. 25).

Plaintiff argues the ALJ "erroneously gave . . . little weight to Dr. Caringi[.]" (Doc. 13, at 13). She acknowledges that "Dr. Carigni had not personally treated Sweeney, [but] he based his findings on a review of the chart in May 2018" (Doc. 13, at 24), but seemingly argues the ALJ violated SSR 06-3p in failing to properly evaluate the opinion, based on a counselor's notes, *see* Doc. 13, at 17-18. Again, the undersigned finds no error. Plaintiff is correct an ALJ must "consider" "other source" opinions and "generally should explain the weight given" to them, SSR 06-03p, 2006 WL 2329939, at *6, but such opinions are not entitled to any special deference. The ALJ followed this mandate here, that the findings in this opinion were: (1) "extreme", (2) significantly more limited than a previous statement, without a corresponding change in treatment notes, and (3) inconsistent with the medical record. These provide more than sufficient explanation for the weight given to this opinion, and are supported by the record. For example, while Plaintiff's

24

mental health treatment was fairly stable from 2016 to 2018, in this May 2018 opinion, Dr. Carigni

opined Plaintiff would be off task 80% of the workday and miss work daily (Tr. 845), as compared

to Ms. Charter/Ms. Kauffman/Dr. Hunt's December 2016 opinion that Plaintiff would be off-task

25% of the workday and miss "more than four days of work per month" (Tr. 500). Further, as

discussed earlier in relation to Dr. Kushner's, and Ms. Charter/Ms. Kauffman/Dr. Hunt's opinion,

the ALJ's statement that the extreme findings in Dr. Carigni's opinion are inconsistent with a

"record [that] consistently shows the claimant having manageable symptoms with medication"

(Tr. 25), is supported by substantial evidence. The undersigned therefore finds no error in the

ALJ's consideration of this opinion.

*Consultative Examiner Dr. Koricke*

To the extent Plaintiff raises an argument regarding Dr. Koricke's consultative opinion, the

undersigned finds no error in the ALJ's evaluation thereof.[9] The ALJ explained her consideration

of this opinion:

> The undersigned gives these opinions partial weight to the extent they support the
> above residual functional capacity. They are consistent with the internal
> examination and the medical record showing the claimant has moderate symptoms
> managed with medication. However, the statements do not show the degree of
> limitation the claimant would have.

(Tr. 27). Plaintiff has not shown any error. First, Plaintiff has not demonstrated any restriction

offered by Dr. Koricke that is inconsistent with the RFC. The RFC contains restrictions related

both to work pressures and to social interaction. *See* Tr. 18 ("understand, remember, and carry out

simple, routine, and repetitive tasks but not at a production-rate pace (e.g. assembly line work);

---

9. The undersigned also notes that this argument could be deemed waived. Plaintiff mentions Dr.
Koricke's opinion in her opening argument paragraph, *see* Doc. 13, at 13 ("[T]he ALJ erroneously
gave . . . partial weight to the consultative examining psychologist Dr. Deborah Koricke[.]"), and
then mentions Dr. Koricke's findings (Doc. 13, at 13-14), but presents no further argument
regarding how the ALJ allegedly erred.

occasionally tolerate changes in a routine work setting; and occasionally interact with supervisors and the public."). Second, to the extent there is any inconsistency between Dr. Koricke's opinion and the RFC, the ALJ provided a reasoned, supported rationale for not assigning the opinion full weight – vagueness. Dr. Koricke's opinion stated that Plaintiff would "have limitations" and "exhibited some difficulty interacting." (Tr. 419). As the ALJ noted, these statements do not indicate a precise degree of limitation. *See, e.g.*, *Rouse v. Comm'r of Soc. Sec.*, 2017 WL 1102684, at *4 (N.D. Ohio) (vagueness of opinion is valid reason for discounting); *Pugh v. Comm'r of Soc. Sec.*, 2015 WL 419000, at *14 (N.D. Ohio) ("In light of her qualified opinion, the ALJ's decision to discount the opinion based on its vagueness is sufficiently clear and supported by the evidence."). Finally, the undersigned notes that the ALJ's RFC was *more* restrictive in the area of completing tasks. *Compare* Tr. 18 (limiting Plaintiff to simple, routine, and repetitive tasks), *with* Tr. 418-19 (noting that Plaintiff had no difficulty with understanding, remembering, or carrying out instructions, and no difficulty with multi-step tasks). This provides support for the ALJ's decision to provide this opinion "partial" weight. That is, "partial weight" does not always mean that the ALJ has discounted or rejected a portion of the opinion.

*State Agency Reviewing Psychologists*

The undersigned agrees with the Commissioner that Plaintiff has not presented a developed argument as to the consideration of the State agency physician opinions. Although in her introductory paragraph, Plaintiff argues "the ALJ erroneously gave . . . partial weight to the reviewing psychologists" (Doc. 13, at 13), and later noting "the ALJ only accorded partial weight to the State Agency reviewing psychologists" (Doc. 13, at 15), Plaintiff provides no further argument as to why this was error or what restrictions the ALJ omitted from the RFC that should have been included. *See* Doc. 13, at 13-20. Therefore, the undersigned finds any argument in this

26

regard waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citation and quotation omitted).[10]

Step Two

Within her treating physician argument, Plaintiff seemingly argues the ALJ erred at Step Two by failing to find her radiculopathy, obesity, hypertension, GERD, and carpal tunnel syndrome status post-surgery as severe impairments, failed to acknowledge her "complaints regarding back pain, her left ankle fracture in 2016, or her wrist fracture after her carpal tunnel surgery" and "erred when she disregarded any limitations these problems caused." (Doc. 13, at 20). But Plaintiff does not elaborate further. Again, the undersigned finds this is not a developed argument and declines to address it. *See McPherson*, 125 F.3d at 995-96.

Step Five

Finally, Plaintiff contends the ALJ's Step Five finding that Plaintiff could return to her past work lacks the support of substantial evidence because the VE testimony relied upon was erroneous. Specifically, she argues that the ALJ included a limitation to simple, routine, repetitive tasks, which amounts to unskilled work, and two of Plaintiff's three past jobs (receptionist and proofreader) were semi-skilled. The Commissioner concedes this error, but responds that it is

---

10. Further, the ALJ's RFC determination reasonably accounts for these opinions, which stated Plaintiff could "perform [a] variety of tasks w[ith] no more than moderate pace or production quotas", and "adapt to infrequent change" (Tr. 125-26) or "perform 1-3 step simple tasks w[ith] no more than moderate pace and no strict production quotas" and "adapt to a setting in which duties are routine" (Tr. 160-61). *Compare* Tr. 18 (ALJ's RFC providing that Plaintiff could "understand, remember, and carry out simple, routine, and repetitive tasks but not at a production-rate pace (e.g. assembly line work); occasionally tolerate changes in a routine work setting; and occasionally interact with supervisors and the public.").

harmless because 1) Plaintiff could still perform her past housekeeping job, and 2) the ALJ made an alternative Step Five finding . For the reasons discussed below, the undersigned agrees with the Commissioner that there was no Step Five error.

To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). However, an ALJ is only required to include in the RFC those restrictions he finds credible and supported. *Irvin v. Social Sec. Admin.*, 573 F. App'x 498, 502 (6th Cir. 2014) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

First, Plaintiff has not shown any inconsistency between her past housekeeping job and the VE's testimony. That is, she argues – and the Commissioner concedes – that the VE was incorrect to state that she could, with the restrictions ultimately found in the RFC, perform her past work as a receptionist and proofreader. This is true because the VE identified those two jobs as "semi-skilled", but the RFC included a limitation to simple, routine, and repetitive tasks, which equates to unskilled work. But Plaintiff has not posed this same challenge to the VE's testimony regarding her housekeeping work, which the VE identified as unskilled. *See* Tr. 111 (identifying the housekeeping cleaner job as having an "SVP [specific vocational preparation] 2"); *see* SSR 00-4p, 2000 WL 1898704, at *3 ("unskilled work corresponds to an SVP of 1-2"). This single job is

28

sufficient to support the ALJ's Step Five finding. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If Plaintiff can perform past relevant work she is, by definition, not disabled. 20 C.F.R. §§ 404.1560(b)(3), 416.960(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled."); *see Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) ("if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.") (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)). Moreover, Plaintiff has not shown any error in the ALJ's alternative finding that Plaintiff could perform other unskilled jobs such as order puller, laundry laborer, and sales attendant. (Tr. 29). This is supported by the testimony from the VE that such alternative jobs would be available in significant numbers. (Tr. 112). As such, the undersigned finds Plaintiff has not shown the ALJ erred at Step Five.

Plaintiff's only other challenge to the ALJ's Step Five analysis is actually a challenge to the ALJ's Step Four RFC analysis. She argues that the hypothetical questions to the VE did not accurately portray her mental limitations – pointing to the work-preclusive limitation posed by her attorney regarding off-task limitations. *See* Tr. 117 (VE testimony that 15% off task is work preclusive). In Reply, she points to her attorney's question to the VE about needing reminders on an hourly basis. *See*  Doc. 17, at 3 (citing Tr. 113-14). However, as discussed above, the ALJ reasonably discounted the medical source opinions in which the off-task limitation was contained and reasonably rejected more restrictive concentration-related limitations. Because an ALJ is only required to include in the RFC those restrictions she finds credible and supported, *Irvin*, 573 F. App'x at 502, and her decision to discount these restrictions is supported, there is no Step Five error in failure to include it in the RFC or the hypothetical to the VE.

In sum, the undersigned finds that the ALJ followed the appropriate legal standards when formulating the RFC, including considering the medical opinions of record. Again, an ALJ's RFC determination must be supported by evidence of record, but it need not correspond to, or even be based on, any specific medical opinion. *See Brown*, 602 F. App'x at 331 Instead, it is the ALJ's duty to formulate a claimant's RFC based on all the relevant, credible evidence of record, medical and otherwise. *Justice*, 515 F. App'x at 587. The ALJ in this case undertook a thorough review of the record evidence, *see* Tr. 17-28, and formulated an RFC with significant restrictions, *see* Tr. 18. The undersigned must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does so here.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.


      s/ James R. Knepp II
United States Magistrate Judge